# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

MAY TERM, 1853.

---

Between RULIF V. SCHANCK and wife, complainants, and JOHN ARROWSMITH et al., defendants.

1. A testator gives a specified sum to each of his four daughters, to be paid to them one year after his decease by one of his sons, to whom (after giving an inconsiderable portion of the real estate to another son) he devises all the residue and remainder of the real estate, and declares, " The real estate above devised to my son is to be bound for the payment of the several sums, until paid to my several sons and daughters."

2. The claims of the legatees to charge the land for the payment of the legacies are resisted, on the ground that they have given to their brother, the devisee, receipts in full for the payment of their respective legacies.

3. It was held that the legal effect of the receipt was to discharge the land of the lien, and, standing without impeachment, it was a bar to the complainants' recovery in the suit. But that it was not conclusive between the parties—it was open to explanation. It was competent for the complainants to show that the money was not paid, or that the receipt was not in fact what it purported to be, " in full " for the legacy. That the principle was well settled that the taking of an additional or other security of inferior or equal degree, would not *ipso facto* discharge a lien which attached by reason of an original security. It is always a question of intention, sometimes to be ascertained by the legal construction and effect of written instruments, sometimes by the circumstances of the case. So where a receipt was given " in full for the legacy," and the money was not paid, but the devisee gave his promissory note, although the legal presumption, from the receipt " speaking for itself," was that the legatee *intended*

314

to relinquish her lien upon the land, and *intended* to receive the note in satisfaction, yet this presumption could be overcome by positive testimony or ·by circumstances. And as it was not satisfactorily shown that the legatee understood her rights, and was aware that the receipt would affect her legal rights under the will, the court would not give the effect to the receipt of destroying the lien upon the land.

4. And this lien will have priority over a mortgage or judgment executed or obtained after the notes were given, even where the mortgage was received, and the debt for which judgment was obtained was contracted, under the supposition that the land was free of the liens. For neither the judgment creditor nor the mortgagee loses anything by any confidence they placed in the fact that the receipts were given. But they were mistaken as to the law.

5. One of the legatees had obtained judgment upon the note given as above stated, and had also presented her claim to the auditors, under an attachment which had been issued. *Held*, that this could not affect her lien under the will. She had two remedies within her reach—she could prosecute on the personal liability, or enforce the lien against the land. She might pursue both remedies simultaneously.

6. Another of the legatees, who had obtained judgment some nine months before the attachment issued, caused execution to be issued on her judgment, by virtue of which a levy was made on the land in controversy, and also on personal property sufficient to satisfy the judgment and execution. After the levy, and prior to the issuing of the attachment, a number of attachments were issued by justices of the peace, and by virtue thereof, the same personal property was levied upon. An arrangement was made between the legatee and the attaching creditors, by which she transferred to them her judgment. The attaching creditors gave her their joint note for the amount due, and took an assignment of the judgment and execution. They then sold the personal property by virtue of their attachments, canceled their note to the legatee, and re-transferred to her the judgment and execution. *Held*, that she had no right, directly or indirectly, voluntarily to relinquish her lien upon the property for the benefit of any other creditor, and that a subsequent *bona fide* judgment creditor must have the preference. That her judgment represents her legacy, and whatever equities attach to the judgment, as between it and subsequent *bona fide* encumbrances, her lien under the will must be subjected to.

7. Where real estate is devised to the same person who is directed to pay a legacy, the legacy will be an equitable charge upon the real estate so devised, unless a contrary intention is expressed in the will, or can be fairly implied from its provisions.

The bill alleges that John Arrowsmith, late of the county of Monmouth, died possessed and seized of considerable real and some personal estate; that at the time of his death he left the following will, to wit: " I do order that all my just debts and funeral charges be paid and satisfied as soon as can conveniently be done after my decease, by my son

John Arrowsmith. Item. I give and bequeath unto my wife, Mary Arrowsmith, the use and occupation of my mansion-house and kitchen during her widowhood, and also to be comfortably supported by my son, John Arrowsmith. And he also to pay unto my said wife, Mary, the legal interest of two hundred dollars yearly and every year during her widowhood. I also give unto my said wife my black girl, named Isabel, during her term of servitude; but if my wife should die before her term of servitude expires, then it is my will that the same Isabel should serve the remainder of her term with my daughter, Maria Arrowsmith. I also give and bequeath to my wife one bed, and bedding for the same, her choice, and household and kitchen furniture sufficient to furnish her room in said house; and also two cows of her choice —the said cows to be kept on the farm—to her heirs and assigns forever; which said bequest and grant I give to my said wife in lieu and in full of dower, or right of dower and interest in my said estate. Item. I give and bequeath unto my four daughters, viz., Maria Arrowsmith, Lydia Arrowsmith, Miranda Arrowsmith and Gitty Arrowsmith, each three hundred dollars, to be paid to them, their heirs or assigns, one year after my decease, by my son John. I also give unto my four daughters above named, each one bed and bedding—Maria to have the choice after her mother; and each six silver teaspoons, to them, their heirs, executors, or administrators, or assigns forever. Item. I give and devise to my son, Simon Arrowsmith, my lot of salt meadow on Cheesequake creek, containing about four acres, be the same more or less; also, ten acres of woodland next and adjoining the lands of Hannah Pitney; the said ten acres to be so laid off as to make the line next to my homestead farm parallel with said Hannah Pitney's line; also, I give and bequeath unto my son, Simon Arrowsmith, the sum of one thousand dollars, to be paid by my son John, five years after my decease. Item. I give and bequeath unto my two sons, Thomas Arrowsmith and William Arrowsmith, the sum of one hundred dollars each, to be paid by my son John, one year after my decease. I give, grant, devise and

bequeath unto my son John Arrowsmith, his heirs, executors, administrators or assigns, all the residue and remainder of my estate, both real and personal, of whatsoever kind and description, not hereinbefore disposed of in this my last testament and last will; also, all my notes, bonds and books of account, I give unto my son John. The real estate above devised to my son John is to be bound for the payment of the several sums until paid to my several sons and daughters. And, lastly, I hereby nominate, constitute and appoint my two sons, Simon Arrowsmith and John Arrowsmith, the executors of this my last will and testament, and hereby revoking and disannulling all former testaments and wills by me made."

The bill further charges that John paid off the legacies to his brothers; that he gave his promissory notes to Lydia and Miranda (now the wife of John Crawford, one of the defendants,) for their legacies; that Lydia recovered a judgment against John in the Circuit Court of the county of Monmouth, upon the note given to her, and that Crawford and wife likewise recovered a judgment on their note; that John gave to the complainant Gitty a note for her legacy; that the said note was not payable to her order or assigns, and was not in the form of negotiable paper, and was represented to her by John as in no respect affecting the complainant's (Gitty's) rights under the will, but was intended solely as a means of enabling him with more facility to settle up the estate; that the note is now in the possession of the complainants, subject to any order of the court; that the legacy is a lien upon the real estate devised to John, and that he took possession subject to said charge; insists that the said legacy is now a lien on the real estate, notwithstanding the note; that John is insolvent, and has left the state; that since the date of the said note the said John has executed a mortgage on the said land to Hendrick Longstreet to secure the sum of $2000; that Austin Reed and Daniel Craig, under the name of Reed & Craig, obtained a judgment against John for five hundred dollars and upwards; that Thomas J. Beedle has issued out a writ of attach-

ment against John as an absconding debtor, and by virtue thereof has attached the said lands and premises; that no part of the principal, and but a small part of the interest of her legacy, has been paid to the complainant Gitty.

The prayer is, that the legacy to Gitty, with the interest thereon, may be decreed to be a charge upon said real estate devised to John by the will of his father, and that in default of payment, so much of the said real estate be sold as may be necessary to satisfy the said encumbrance, and all such other encumbrances, if any, as shall seem reasonable and just, &c.

To this bill Mary, Lydia and Miranda, with her husband, John G. Crawford, filed their joint and several answers, and after admitting the allegations of the bill, Mary, (the widow) answering for herself, says : That John has only paid her the legal interest on the two hundred dollars up to the 11th December, 1836 ; that for the last two years John has been extremely intemperate; that in 1846 the mansion-house and kitchen, named in the will, burnt down, and that although John built a new house, he refused to furnish her with a comfortable support, according to the terms of the will; that in 1836 John's habits became grossly intemperate, and his conduct to her so cruel that it was dangerous for her to live with him; that for a long time previous thereto he had neglected and refused to support her comfortably on the premises or anywhere else, and that she was obliged to take refuge with her daughter Lydia, and that John has, ever since the 29th of October, 1846, refused to furnish her any support; that he refused to furnish her with the two cows named in the will. She insists and claims that her right to the use and occupation of the mansion-house and kitchen, to a comfortable support, and to the legal interest on two hundred dollars a year during her widowhood, and to the keeping of the two cows, are liens upon the real estate devised to John ; and that an account should be taken of the value, of the use and occupation, of the value of a mansion and kitchen as good as that existing at the death of her husband, during her widowhood, and of the value of her comfortable support

during her widowhood, and what may be due her for arrears of said support, and the use and value of keeping two cows, and of the arrears of rent due her yearly on the two hundred dollars, and that the gross or weekly, or yearly value thereof, and of all arrears, may be ascertained and declared to be a first lien on the said real estate, and be first paid out of the proceeds of the sale thereof.

Lydia admits the payment of fifty dollars on her legacy, and states that John gave her his note, not negotiable, for the balance, being two hundred and fifty dollars, dated July 23d, 1838 ; and that in August, 1848, she recovered a judgment on the note, together with other claims, for an amount of four hundred and sixty-three dollars and seventy-seven cents ; that, when John gave her the note, he represented to her it would in no wise affect her claim under the will, but was intended solely as a means to enable him with more facility to settle the estate, and that the said note now remains in her hands unpaid.

Crawford and wife admit that, on the 4th of May, 1847, John gave his promissory note to Miranda for two hundred and thirty-five dollars and seventy-two cents, the amount of principal and interest then due her on her said legacy ; that it was payable to her and not to her order, and was not negotiable, and that, at the time he gave it, John made the like representations to her as he had made to his other sisters ; that they have recovered judgment on the said note, and that the, said note remains in their hands unsatisfied. The defendants state that there is no personal property to pay the legacies ; that John is insolvent, and they insist that the legacies and widow's claims are liens on the said real estate.

Thomas J. Beedle, by his answer, sets up his judgment in attachment. He insists that the notes and receipts given at the time, (which are more fully set out in John Arrowsmith's answer,) and the judgments obtained, are extinguishments of any lien upon the lands.

And he further says that, as to Lydia's claim, that after she had obtained judgment and issued execution thereon, and

Schanck and wife v. Arrowsmith et al.

levied on the real and personal estate of J. A., several attachments were taken out before a justice of the peace, against the property of J. A., and judgments obtained thereon ; that the levy on her judgment and execution being prior to the attachments, the attaching creditors applied to Lydia to purchase her judgment, and did purchase it ; that this was done to enable them to make the money on their attachments out of the personal estate, and thereby throw the whole amount of Lydia's said execution on the realty ; that, after they had so purchased the said judgment, they proceeded to sell under their attachments the personal property of J. A., holding, at the same time, the older execution issued on Lydia's judg-. ment ; that, after this was accomplished, they assigned the judgment back again to Lydia, and took up a note which they had given for the same.

As to Miranda's claim, the defendant further states that she and her husband have filed their claim before the auditors in attachment, and have thereby waived their lien upon the land.

John Arrowsmith admits the giving of the promissory notes to his three sisters, but alleges that, before he settled the estate in the Orphans' Court, to wit, on the 16th day of December, 1835, he settled with his sisters ; that, at the settlement, he took from Gertrude the following receipt, viz. : "Received of John Arrowsmith, one of the executors of Henry M. Arrowsmith, deceased, three hundred dollars, and one bed and bedding, appraised at forty dollars, and six silver spoons, in full of legacies bequeathed to me in the last will and testament of said deceased. December 16th, 1835. Gertrude Arrowsmith." And that he took from Miranda and Lydia like receipts ; that, at the time the receipts were given, he did not pay in money, but gave to them severally his promissory notes for the same, or such part or parts thereof as he did not then pay and satisfy ; that the said notes were taken with the assent of the legatees ; that, at the time they were taken, he stated to them he wished them to take the notes and to give them their receipts in full for said legacies ; that he wished to have his farm clear of the

lien or charge of said legacies, as he might want to sell it. And it was expressly understood, and agreed and intended, by the said parties, at the time, that by taking the said notes and giving the said receipts, the farm and said estate should be cleared and exempted from the charge of the said legacies. He admits the recovering of the judgments by Lydia and Miranda, and insists that the legacies are not liens upon the land, but that they must look to their judgments and to him personally, for payment.

*W. L. Dayton*, for complainants, cited 1 *Smith's Leading Cases* 260 ; 21 *Wend.* 450 ; 19 *Ib.* 516 ; 1 *Hill* 517 ; 2 *Wash. Cir. Ct. R.* 191, 193 ; 5 *John.* 68, 73 ; 8 *Ib.* 389 ; 9 *Ib.* 310 ; 15 *Ib.* 247 ; *December No. A. L. R.* 87 ; *Chitty on Con.* 294, 299 ; 1 *Hal. Ch. R.* 493.

*P. D. Vroom*, for John Arrowsmith and Thomas J. Beedle.

*P. T. Vredenburgh*, for the administrator of the widow and Lydia and Miranda, cited 1 *Dallas* 420 ; 20 *Wend.* 17 ; 13 *John. R.* 244 ; 14 *Ib.* 404 ; 4 *Cowen's Rep.* 567 ; 3 *East* 258 ; 2 *Binney* 152 ; 11 *John.* 513 ; 1 *Cowen* 578 ; 5 *Wend.* 129 ; 4 *Ib.* 339 ; *Fonb. Eq.* 182.

THE CHANCELLOR. The object of the bill is to raise, by sale, out of the real estate of which Henry M. Arrowsmith died seized, the amount of a legacy, which, by his will, he left to his daughter Gertrude, one of the complainants.

John Arrowsmith is made a defendant in the suit, because he is the devisee of the real estate upon which, it is alleged, the legacy is chargeable.

Mary Arrowsmith, who, since filing the bill, is deceased, and is now represented by her administrator, was made a defendant, because, as the widow of the testator, she claimed a lien or charge upon the estate, by reason of a bequest made to her by the testator.

Mary, Maria, and Lydia Arrowsmith, and Miranda Crawford, are made defendants, because they claim, as legatees of

the testator, like liens as the complainants, for legacies to them, respectively.

Hendrick Longstreet holds a mortgage on the land, executed to him by John Arrowsmith, the devisee, and Thomas J. Beedle is a judgment creditor of John Arrowsmith.

By the pleadings, the rights of all these persons are to be determined and adjusted.

As to all the parties claiming under the will, with the exception of Mary Arrowsmith, the widow, their rights are not controverted.

To his daughters, Maria, Lydia, Miranda, and Gertrude, the testator gives the sum of three hundred dollars each, to be paid to them, their heirs and assigns, one year after his decease, by his son John; and, after giving an inconsiderable portion of his real estate to his son Simon, he devises all the residue and remainder of his real estate to his son John, in fee, and declares, "The real estate above devised to my son John, is to be bound for the payment of the several sums, until paid to my several sons and daughters."

The claims of the legatees in this suit, to charge the land for the payment of their legacies, are resisted, on the ground that they have given to John Arrowsmith, the devisee, receipts in full, for the payment of their respective legacies.

The rights of the parties will be examined separately, as they vary, in some particulars which are deemed of importance.

First, as to the claim of Gertrude, one of the complainants.

On the 16th of December, 1835, Gertrude gave to John the following receipt: "Received of John Arrowsmith, one of the executors of Henry M. Arrowsmith, deceased, three hundred dollars, and one bed and bedding, appraised at forty dollars, and six silver spoons, in full of legacies bequeathed to me in the last will and testament of said deceased."

The fact of a bed and bedding and six silver spoons, being included in the receipt, has no bearing upon the question

raised. They are articles specifically bequeathed to the legatee by the will.

The legal effect of this receipt is to discharge the land of the lien, and standing without impeachment, is a bar to the complainants' recovery in this suit. But it is not conclusive between the parties. It is open to explanation; and it is competent for the complainants to show that the money was not paid, or that the receipt was not, in fact, what it purports to be, " in full" for the legacy.

It is admitted that at the time the receipt was given, the money specified therein was not paid, but that John gave to his sister his promissory note for the amount. That note remained outstanding until the fourth of May, 1847, when it was renewed by a note of four hundred dollars. Some interest was, from time to time, paid on the notes.

It was not controverted on the argument that the principle is considered as well settled, that the taking of an additional or other security, of inferior or equal degree, will not *ipso facto* discharge a lien which attached by reason of an original security. If the original security is actually canceled, or the lien created by it formally released, of course no resort can be had to it. It is always a question of intention; sometimes to be ascertained by the legal construction and effect of written instruments; sometimes by the circumstances of the case.

But the defendants rely upon the receipt. They say it is a receipt " in full" for the legacy. It is the evidence that Gertrude received the note in satisfaction, and that she thereby intended to relinquish her lien upon the land. *Prima facie* this is so. The receipt speaking for itself, will have that effect; such is the legal presumption, and it must be so construed, unless there is something—either positive testimony, or circumstances of a character to overcome the presumption.

John Arrowsmith, in his answer, says that at the time he gave the note, he stated to his sister that he wished her to take his note, and to give her receipt in full of the legacy— that he wished to have his farm clear of the lien or charge

of the legacy, as he might want to sell it; and that it was expressly understood and agreed, and intended by both parties at the time, that by taking the note and giving the receipt the real estate should be cleared and exempted from the charge of the legacy.

These allegations are not proved, and the defendant is not entitled to the benefit of them, except as negations to charges in the bill. The bill alleges that when the note was given, John represented to the complainant Gertrude that it in no respect affected her rights under the will. The portion of the answer alluded to is responsive to this charge, and a denial of it; but when the defendant goes further, and alleges a different agreement or understanding, he must, in order to derive any benefit from it, prove it as it is alleged in his answer.

Looking at the character of the transaction itself, and the circumstances under which the receipt was given, what did the parties intend by that receipt?

The testator had given the largest portion of his estate to his son John. He had cut off this daughter from the inheritance of the real estate, and in lieu of it, directed John to pay her three hundred dollars, and declared, in express terms, that the legacy should be a charge upon the land until it was paid. He dies and leaves his widow, his son, John, and his four daughters, living upon the homestead. Soon after his father's death, John gives each of his sisters a note for their respective legacies, and draws up receipts in his own handwriting, for each of them, which they sign, purporting to be " in full" for their legacies. No person was present to act on behalf of the girls, and explain to them their legal rights, or the effect of the receipts they were about to give. They were dealing with a brother in whom they confided, and upon whom they felt in a measure dependent. Why should they have taken John's mere personal security and released the land? Their father, by his will, had secured to them their legacies upon the land. He did not see proper to trust to the mere personal security of his son. The relation of the parties must be looked at—

the character of the debt, the consideration given, and the circumstances attending the whole transaction—in order to determine what effect ought to be given to the receipt. It appears to me, in looking at the whole case, a court of equity ought not to give the effect to that receipt, of destroying the lien upon the land, without its being satisfactorily shown that Gertrude understood her rights, and was aware that the receipt would affect her legal rights under the will. We can hardly suppose that she understood the difference between a receipt "in full" for the legacy or a mere receipt for the notes given to her. If that receipt is to discharge the land, the legatee relinquished, without any consideration, the very security by which her father intended to make her legacy secure to her.

In the case of *Sutton et al.* v. *The Albatross*, reported in the December number of the *American Law Register*, Mr. Justice Grier, in a case where a receipt "in full" was set up as extinguishing a lien, remarks "The giving the receipts for the notes, as in full of the account, it is true, is *prima facie* evidence that such was the case. But a receipt is no estoppel; and when we consider how little attention is usually paid to the peculiar form or expressions of such documents, signed by mechanics and drawn up by the clerk of the employer, such formal words may be easily rebutted, by showing the true nature of the transaction. The note taken is no higher security than the account, and unless the transaction shows an intention to surrender without consideration, the better security, these formal words in a receipt given, when the account is settled, ought not to be considered as at all conclusive of an intention to receive the lesser security as satisfaction." See also case of *Jones* v. *Shawhan*, 4 *Watts and Serg.* 263. I do not think the receipt destroys the lien upon the land.

But it is further insisted that this lien should be postponed to the payment of Longstreet's mortgage and Beedle's judgment.

As to the mortgage, the mortgagee sets up no equity, and asks for no priority over this lien. If the mortgagee was mis-

led by the receipt or by the conduct of the complainant Gertrude, so as to entitle him in equity to have his lien preferred, he should have come in by answer and set up his equity. The bill charges the mortgage to be a subsequent encumbrance. So it is upon its face. If there are any circumstances to give it a preference they must be placed upon the record, and be submitted to the decision of the court.

Beedle, the judgment creditor, has answered. His judgment was obtained on an attachment in the year 1849. He alleges that when his debt was contracted he understood and believed that the legacies had been settled and arranged by John—that he knew by information from John, that receipts had been given for the legacies, and that it was known by others that a settlement had been made by John with the legatees, and that they had taken his notes for the amount and in satisfaction for the legacies. He does not pretend that he gave John credit, or that the debt in question was contracted upon the faith of John's owning the property free of these liens. He made no inquiry of the legatees. He knew the legacies were not paid, and that John had given nothing more to liquidate them than his promissory notes. He knew the circumstances, and he supposed the lien on the land was discharged. He was mistaken as to the law. He loses nothing by any confidence he placed in the fact that the receipts were given.

I think the amount due Gertrude on her legacy is a lien upon the land, and has priority over the mortgage and judgment.

The claim of Miranda Crawford rests upon the same ground as that of Gertrude, with the exception that upon the note given her she obtained judgment against John Arrowsmith, and also presented her claim to the auditors under the attachment.

The fact of her obtaining judgment, cannot, I think, affect her lien under the will. She had two remedies within her reach. She could prosecute John on his personal liability or enforce her lien against the land. She might pursue both her remedies simultaneously without affecting either, or one of them, at her pleasure; and until the debt was discharged

by actual payment, no objection could be made to either prosecution. The judgment did not discharge the debt, nor was it a merger of the claim upon the land. Nor can I see that the presenting her claim to the auditors could abridge her rights. The judgment was obtained May 1st, 1849, and was subsequent to the attachment. She knew her claim under the will was a matter to be contested. From abundant caution, she presented her claim to the auditors, and not with the intention of abandoning any lien or priority she might otherwise have.

As to the claim of Lydia. Upon the note given her she obtained judgment some nine months before Beedle's attachment was issued. By John Arrowsmith it is insisted that the course pursued by Lydia under her judgment was an abandonment or waiver of her lien under the will ; and by Beedle it is insisted further that, if not a waiver, it ought to postpone her claim upon the land to his judgment, as well as to Longstreet's mortgage.

Lydia caused execution to be issued on her judgment, by virtue of which a levy was made on the land in controversy, and also on personal property sufficient to satisfy the judgment and execution. After the levy, and prior to the issuing of Beedle's attachment, a number of attachments were issued by justices of the peace, and by virtue thereof the same personal property was levied upon. An arrangement was made between Lydia and these attaching creditors by which she transferred to them her judgment.

It was a mere formal arrangement, entered into for the purpose of so controlling that judgment and execution as to appropriate the personal property to the payment of the attachments, and throwing the whole burthen of the judgment upon the real estate. The attaching creditors gave Lydia their joint note for the amount due, and took an assignment of her judgment and execution. They then sold the personal property by virtue of their attachments, and realized out of the sale the sum of three hundred and eighty-six dollars and fifty-seven cents. Their note to Lydia was then canceled, and the judgment and execution transferred to her.

If John Arrowsmith had set up his answer, and insisted that the judgment of Lydia should be declared satisfied as against him, I should, under all the circumstances attending the transactions, have been much inclined to that conclusion. From the testimony of Sheriff Conover, it appears that he levied upon personal property worth from eight hundred to one thousand dollars. It was taken under the law, by the sheriff, to pay that execution, and the defendant was deprived of all control over it. There is no pretence that it was left with the defendant at his request, or for his accommodation. The sheriff having taken the defendant's property to pay the debt, the defendant had a right to have it so appropriated. The moment the sheriff took the property, the defendant was entitled to have it credited on his execution. The defendant could not compel him to sell it. If the sheriff did not sell it, he was accountable to the plaintiff. If the plaintiff has, in any way, relieved the sheriff from that accountability, he had a right to do so ; but in doing so he cannot affect the rights of the defendant. The plaintiff, by process of law, took the property out of the defendant's possession to pay the debt due on the execution. She had no right, directly or indirectly, voluntarily to relinquish her lien upon it for the benefit of any other creditor without the consent of the defendant. Look at the consequences to the defendant in this case. Lydia obtains judgment against him, and levies upon personal property to the amount of upwards of eight hundred dollars, more than twice sufficient to pay the judgment. The defendant leaves the state, and some five or six attachments are taken out against him. The judgment and attaching creditors then arrange between themselves to give the latter the preference, and finally this property, which, when taken by the sheriff, was worth from eight hundred dollars to one thousand dollars, is sold by constables for three hundred and eighty-six dollars and fifty-seven cents. Who ought to bear this loss ? Most assuredly the judgment creditor, unless he can show some good reason why, in equity, the burthen should be placed upon the debtor.

As to Beedle, who is a subsequent *bona fide* judgment creditor, I have no doubt as to the equities between his judgment and that of Lydia Arrowsmith's. According to the principle recognized in the case of Johnson *v.* Tuttle and others, decided at this term, Beedle's judgment must have the preference. Lydia's judgment represents her legacy. Whatever equities attach to the judgment, as between it and subsequent *bona fide* encumbrances, her lien under the will must be subjected to.

Let a decree be drawn in conformity to these views.

The only subject remaining for consideration is as to the rights of Mary Arrowsmith, the widow, under the will.

The testator orders his son John to pay all his debts, and then declares, "I give and bequeath unto my wife, Mary Arrowsmith, the use and occupation of my mansion-house and kitchen during her widowhood, and also to be comfortably supported by my son, John Arrowsmith, and he also to pay unto my wife Mary the legal interest of two hundred dollars yearly and every year during her widowhood. I also give and bequeath to my wife one bed and bedding for the same, her choice, and household and kitchen furniture sufficient to furnish her room in said house ; and also two cows to be kept on the farm, to her heirs and assigns forever ; which said bequest and grant I give to my said wife in lieu and in full of dower, or right of dower, in and to my estate." The testator then gives pecuniary legacies to each of his four daughters, and to three of his sons—a small lot of land to another, and then all the residue and remainder of his estate, real and personal, he devises to his son John, and then makes the legacies to his sons and daughters in express terms charges on the real estate devised to John. By his answer, John neither admits or denies the bequests to his mother to be charges on the land, but answers he was always ready and willing to perform what was enjoined on him under the will, and to give her a comfortable support, and did actually furnish and supply her with more than the requirements of the will.

It has frequently been decided that where the real estate is devised to the same person who is directed to pay the legacy, it will be an equitable charge upon the real estate so devised, unless a contrary intention is expressed in the will, or can be fairly implied from its provisions. *Harris* v. *Fly and others,* 7 *Paige* 421, and cases there cited ; also 1 *U. S. Eq. Dig.,* p. 382, § 735. The case of *Mathewson* v. *Saunders,* 11 *Conn.* 104, is much in point.

In this case the will provides a home for the widow on the land, and orders John, the devisee of that land, there to maintain and support her. It directs her to release her dower in the land to John, and leaves her without means of support, except such provision as John is ordered by the will to provide her. It was the intention of the testator, fairly inferable from the whole will, that his real estate should be chargeable with the support of his widow, and should be bound for the payment of the legacies he had given her.

It is proper, from the evidence before me, to give some directions as to taking the accounts of the widow's claims.

By the will, she was to occupy the house and kitchen on the land. These buildings were destroyed by fire, some years after the testator's death. It is insisted that John was bound to replace them, or give her an equivalent. This is not so. The loss must be sustained by the widow. The land is only to be charged for such reasonable sum as would have supported her, if occupying the dwellings designated and provided for her. And, in taking the account for her support and maintenance, it must be taken only from the time of instituting these proceedings. It is not denied that John provided for her while she lived on the farm, and there is evidence that afterwards, while she resided with her daughter Lydia, he furnished provisions for the family, and did a large amount of work for Lydia, which may be properly considered in the light of compensation for the mother's board. He offered her a home at his own house, which she refused, and without deciding whether the evidence is sufficient to justify her in such refusal, there is no proof that

any demand was made upon John for her support at any time, or any complaint that he did not provide for her.

A charge must be made of the interest on two hundred dollars from the eleventh of December, 1836, to the time of the widow's death.

She was entitled to have two cows kept on the land during her life. It does not appear that this right was ever denied her. But as to the value of the cows and their keeping, the benefit of them will be denied in taking an account of the support. The amount required for such support would have been so much the less had she enjoyed the profit of the cows.

In taking the accounts, the defendants will be at liberty to prove any advances made in money or otherwise, by John for the widow's benefit, and to proper allowance for the same.

Let an account be taken of the amounts due Gertrude, Lydia and Amanda, each, on their legacies.

The claims of Gertrude, Amanda and the widow of the testator, are entitled to priority, and then the Longstreet mortgage.

One-third of the residue must be invested for the dower right of John Arrowsmith's (son) widow. Out of the remaining two-thirds, the costs of the attachment must first be paid; then the creditors who have come in under the attachment *pro rata*, and then Lydia's judgment. After the death of the widow of John, the principal money invested for the widow's dower, must be distributed according to the priorities here established.

CITED *in Van Duyne* v. *Van Duyne,* 1 *McCar.* 53; *Grode* v. *Van Valen,* 10 *C. E. Gr.* 97; *Blauvelt* v. *Van Winkle,* 2 *Stew.* 116.